1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                 FOR THE EASTERN DISTRICT OF CALIFORNIA

9    LEVON GRAHAM,

10            Plaintiff,                    No. 2:07-CV-2291 GGH P

11        vs.

12   D.L. RUNNELS, et al.,

13            Defendants.                   ORDER

14   _____/

15   _Introduction and Summary_

16        Plaintiff, a state prisoner proceeding with appointed counsel, seeks relief pursuant

17   to 42 U.S.C. §1983.  On May 24, 2012, a motion for summary judgment, filed on March 29,

18   2012, brought by defendants T. Kopec and A. Martin, came on for hearing.  Plaintiff was

19   represented by Brian Berry of Latham & Watkins, LLP, accompanied by colleagues Brendan

20   Kelleher and Genevieve Jenkins; Deputy Attorney General Jaime Ganson appeared on behalf of

21   defendants.

22        As seen below, a total of seven claims are germane for this summary judgment.

23   However, only three give real pause before ultimate deferral for trial, and one claim (defendant

24   Kopec) results in summary judgment.  This concededly tardy litigation can only be saved through

25   equitable tolling – plaintiff's alleged mental problems.  Although the outcome is doubtful for

26   plaintiff's assertion, the matter must be placed before the trier of fact.  Plaintiff's administrative

complaint was exhausted at the second level.  In any event, plaintiff's medical condition might well indicate an equitable exception to the third level *sua sponte* finding that plaintiff's initial grievance was made out of time; if not exhausted at the second level, this too must await trial. On the merits of excessive force, two conflicting inferential findings are at play: defendant's assertion of mistake in utilizing a weapon/ammunition not authorized for plaintiff's cell extraction, and hence an innocent state of mind; plaintiff's testimony that the user of the unauthorized weapon/ammunition had threatened injury to plaintiff earlier on the day of the incident, making the assertion of mistake, as opposed to maliciousness, less likely.  The determination of the correct inference must certainly await trial.  Finally, Kopec's liability, as an off scene official-in-charge, can only be found if plaintiff's speculation heaped upon speculation can defeat summary judgment, and it cannot.

*Issues on Motion for Summary Judgment*

Defendants raise the following grounds in their motion for summary judgment on the following grounds: 1) the action was not filed within the limitations period; 2) the action is barred by laches; 3) defendant Martin's use of the 40B stinger round was not intentional and did not constitute excessive force; 4) defendant Kopec had no supervisory liability for use of the 40B stinger round, and; 5) plaintiff failed to exhaust administrative remedies; 6) Heck v. Humphrey bars this action because the excessive force claim would undermine plaintiff's credit forfeiture resulting from disciplinary action against him; 7) defendants are entitled to qualified immunity.

*Summary Judgment Legal Standard*

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions

1       on file, together with the affidavits, if any," which it believes
        demonstrate the absence of a genuine issue of material fact.
2

3   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

4   P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

5   issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

6   depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

7   should be entered, after adequate time for discovery and upon motion, against a party who fails to

8   make a showing sufficient to establish the existence of an element essential to that party's case,

9   and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

10  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

11  necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

12  should be granted, "so long as whatever is before the district court demonstrates that the standard

13  for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

14  2553.

15      If the moving party meets its initial responsibility, the burden then shifts to the

16  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

17  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

18  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

19  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

20  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

21  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

22  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

23  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

24  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

25  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

26  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

3

1  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

2          In the endeavor to establish the existence of a factual dispute, the opposing party

3  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

4  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

5  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

6  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

7  genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

8  56(e) advisory committee's note on 1963 amendments).

9          In resolving the summary judgment motion, the court examines the pleadings,

10  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

11  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

12  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

13  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

14  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

15  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

16  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

17  (9th Cir. 1987).  Thus, to demonstrate a genuine issue, the opposing party "must do more than

18  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

19  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

20  'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

21          Finally, the court is mindful "that at the summary judgment stage the judge's

22  function is not himself [or herself] to weigh the evidence and determine the truth of the matter

23  but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

24  477 U.S. at 249, 106 S. Ct. at 2511.  Thus, it is not for this court to make a credibility

25  determination on a motion for summary judgment.  Dominguez-Curry v. Nevada Transp. Dept.,

26  424 F.3d 1027, 1036 (9th Cir.  2005)("[I]t is axiomatic that disputes about material facts and

4

1   credibility determinations must be resolved at trial, not on summary judgment.") [Internal

2   citation omitted].

3   *Undisputed Material Facts*[1]

4               In a nutshell, the case involves the firing of a "40B Stinger" round[2] at plaintiff

5   during the process of a cell extraction.  Use of the device was concededly unauthorized for the

6   situation facing the Corrections officers.

7               The following of defendants' undisputed material facts are in fact undisputed and

8   have been admitted by plaintiff with any caveats by plaintiff footnoted where applicable.  1. On

9   December 20, 2001, plaintiff Levon Graham was a state prison inmate incarcerated at High

10  Desert State Prison (HDSP).  2. Plaintiff [on Dec. 20, 2001] was housed in administrative

11  segregation (Ad Seg), where he was single-celled.  3. Defendant A. Martin was employed as a

12  sergeant at HDSP.   4. Defendant T. Kopec was employed as Acting Facility Captain at HDSP.

13  5. On Dec. 20, 2001, plaintiff broke the fire suppression sprinkler in his cell.  9.  Defendant

14  Martin instructed plaintiff to submit to handcuffs and exit the cell so that maintenance staff could

15  repair the sprinkler head.   10. Plaintiff refused to comply with defendant Martin's order.  11.  A

16  tactical extraction team was authorized to remove plaintiff from his cell. 14.  Defendant Kopec

17  did not have the authority to authorize use of a 40B stinger round.  15.  Launchers and munitions

18  were stored in the control booth.  17. It was common practice for defendant Martin to

19  communicate through the window in the control booth. 18. Defendant Martin yelled to the

20  control booth operator, Officer Spidle, and Spidle came to the control booth window.  20.

21  ───────────────

22      [1]Many of the facts submitted by the parties have been deemed sensitive so as to require
    redaction.  The undersigned deals with that redaction in a separate order.  With respect to this

23  order, the court finds that all of the facts herein mentioned are not sensitive, or not sensitive
    enough, to require redaction.

24      [2]40 B Stinger rounds are fired by use of smokeless powder.  Each round consists of a
    number of rubber balls.  The weapon is a type of pain compliance device most often used in

25  crowd control situations.  It is generally inappropriate to use the device for single subject pain
    compliance.  See e.g., www.defense-technology.com/pdfs/specs/40MM%2060-

26  Cal%20Stinger.pdf

Defendant Martin had worked with Officer Spidle before, did not know him to be careless, had

no reason to believe he was not fully competent, and trusted him.  22.  Officer Spidle handed

defendant Martin a 40 mm launcher and a handful of rounds through the "window" in the floor of

the control booth.  23.  Officer Spidle did not indicate to defendant Martin that he had been

unable to hear which rounds he requested, or that he was providing defendant Martin any rounds

other than the T-21 blast dispersion rounds.  28.  The 40 mm launcher is a weapon that was used

to deploy both T-21 blast dispersion rounds and 40B stinger rounds.  34.  It was 13 feet and 1/4

inch from the food port to the back of plaintiff's cell.  35.  On Dec. 20, 2001, plaintiff was

extracted from his cell.  38.  Defendant Martin's direct supervisor, Lieutenant Wright, was

present during the extraction.  41.  It was committee day.  42.  On committee day, the warden,

chief deputy warden, and associate wardens are in the Ad Seg Unit to evaluate inmates' cases.[3]

43.  Committee meetings are held in the dining hall attached to the building.  44.  Committee day

is busy because there is a lot of movement of inmates.  The inmates need to be fed and the

inmates to be seen at committee must be searched, clothed, and brought to holding cells.  46.

The cell extraction could be observed by someone standing just a few steps outside the dining

hall.  47.  Plaintiff was issued the Calculated Use of Force Advisement, ordered to submit to

handcuffs and exit the cell, instructed that if he failed to obey the order he would be physically

removed from the cell, and warned that physical force may be used to facilitate his removal from

the cell.  48.  Plaintiff did not comply.  49.  Plaintiff wrapped himself in a blanket and got under

a table at the back of the cell.  50.  It was determined that force was necessary to remove plaintiff

from the cell.  52.  Aiming the launcher upward was made difficult by the steel food port door,

which is hinged and fold[s] down and outward from the bottom, so that it remains perpendicular

[3] Plaintiff admits this fact to the extent it signifies that these officials were in ad seg but states that he denies any suggestion that the officials could physically see the cell extraction from their location at the time.  Opp. to DUF, citing Kopec Dep. 98:14-16 (wherein he states that had "no firsthand knowledge of what went on during the extraction.")  Defendant Martin is correct, however, that plaintiff does not actually thereby provide evidence to support the asserted portion of denial, leaving the fact undisputed.  Reply to DUF.

1   to the base of the food port when open, making it difficult to aim the launcher at an upward

2   angle.  54.  Using the 40mm launcher, defendant Martin deployed one round into plaintiff's cell.

3   62.  On Dec. 20, 2001, plaintiff was extracted from his cell.  64.  The projectiles released from a

4   stinger round that ricochet, as opposed to a direct hit, have less velocity.  65.  One of the cornrow

5   braids in plaintiff's hair diffused the impact, and the projectile did not break the skin.  67.

6   Plaintiff was then instructed to submit to handcuffs, but refused.  68.  Plaintiff failed to comply

7   with multiple additional orders to submit to handcuffs and exit the cell.  69.  Oleoresin Capsicum

8   was twice discharged into the cell.  70.  Plaintiff did not immediately exit the cell.  71.  Nearly

9   ten minutes after the 40B stinger round was deployed, plaintiff submitted to handcuffs at the

10  front of the cell.  73.  During an interview that same day, plaintiff conceded that the treatment

11  [MTA] Barton provided was "satisfactory."  75.  Defendant Kopec was not responsible for

12  defendant Martin's training.  78.  Sergeant Park, who was the Armory Sergeant at the prison in

13  2001, assisted in the investigation of defendant Martin's use of the 40B stinger round during

14  plaintiff's cell extraction and determined that, although defendant Martin's use of the round was

15  not in compliance with CDCR policy or procedure, "his in-cell use of the 40B stinger round met

16  the minimum factory specifications, including the minimum distance required when deploying

17  the round" and "constituted less-lethal force."  79.  Plaintiff received disciplinary rule violation

18  report ASU-01-12-0026, under CAL. CODE REGS. tit.xv, § 3005(b), for delaying a correctional

19  officer in the performance of his duties, for his conduct on December 20, 2001.  80.  Based on a

20  preponderance of the evidence presented at the hearing, plaintiff was found guilty of delaying a

21  correctional officer in the performance of his duties.  83.  The only grievance plaintiff filed,

22  which could be found to address his claim that excessive force was used during his December 20,

23  2001, cell extraction, is HDSP-S-02-00689.  84.  Grievance HDSP-S-02-00689 was submitted on

24  April 4, 2002.  87.  On December 7, 2002, plaintiff was released on parole.  88.  On July 26,

25  2002, plaintiff filed case no. 2:02-cv-01592 ("previous action").  89.  The previous action

26  involved the same claims as this action.  90.  The previous action was dismissed without

prejudice on March 16, 2004, before the Court effected service.  91.  On Sept. 29, 2006, plaintiff

indicated he was refiling this action.  92.  Plaintiff did not file this action until Sept. 17, 2007.

93.  The complaint originally filed in this action contains a single paragraph containing the

allegations underlying plaintiff's Eighth Amendment claim.  95.  Plaintiff was arrested for

multiple felony state law violations committed on May 13, 2003.  97.  Plaintiff was admitted, on

Sept. 15, 2003, to Patton State Hospital.  98.  Patton State Hospital staff discharged plaintiff back

to court on Nov. 10, 2003.  99.  On Feb. 19, 2004, plaintiff's mental competence was again

challenged.  100.  On Sept. 13, 2004, plaintiff again was admitted to Patton State Hospital.  101.

Upon his admission, a Patton psychiatrist observed that plaintiff "may be malingering," noting

that plaintiff "mentally appears alert, although he presents himself as some[body] who is

hallucinating and is delusional." (Medical Records at Med. -011).[4]  102.  The medical notes state:

"There seems to be a selective loss for recent and remote events depending on what information

he wants to be told or provide." (Medical Records at Med-009).[5]  103.  The medical notes

indicate that it seemed plaintiff could fully understand the questions asked of him. (Medical

---

[4] Plaintiff asserts that in the same document cited by defendants, staff psychiatrist Boniface Dy, M.D., diagnosed plaintiff as having "psychotic disorder" and ordered a treatment plan focusing on hallucinations.  Docket # 113, p. 68, citing Ganson Declaration, Ex. C (Medical Records at Med. -010-11).  Defendants reply that this is a misstatement of the evidence because the record indicates plaintiff was diagnosed with "Psychotic Disorder, NOS, Rule out Malingering," signifying that malingering had not been ruled out."  Reply to rsp to DUF, citing Ganson Dec., Ex. C (Medical Records at Med-010).  Defendants contend that this is consistent with the observation of Patton psychiatrists' that plaintiff "may be malingering" and that plaintiff "mentally appears alert, although he presents himself as someone who is hallucinating and is delusional."  Id. at Med -011.  Defendants cite Lujan v. National Wildlife Federation, 497 U.S. 871, 888, 110 S. Ct. 3177 (1990), for the proposition that a factual issue in controversy must be resolved in the non-moving party's favor only where the fact the movant avers specifically contradicts the fact averred by the moving party.  In any case, plaintiff has admitted the fact.

[5] Plaintiff notes that in the same document that defendants cite here, doctors state that plaintiff's speech is "rambling" and that he accused hospital staff of "tak[ing] his blood in order to clone him."  Dkt. # 113 at 68, citing Ganson Dec. Ex. C (Medical Records at Med-009).  Again, defendants take issue with this response, noting that plaintiff at DUF 107 admits that the criminal court held expressly that plaintiff  "IS EXAGGERATING AND FAKING HIS SYMPTOMS TO AVOID CRIMINAL RESPONSIBILITY."  Reply to Rsp to DUF 102.

Records at Med.-009).[6] 104.  The medical notes indicate that although plaintiff "expressed his

delusions and hallucinations," he also "was observed to be interacting very well with other

patients," and "spoke logically with good association of ideas." (Medical Records at Med.-005).[7]

105.  On November 8, 2004, Graham again was determined to be competent and was discharged

back to court. (Medical Records at Med.-004, 005).  106.  On July 13, 2005, Graham's challenge

to the certificate of mental competence was held in the Los Angeles criminal court.  107.  The

court denied the challenge to mental competency, and expressly held that plaintiff  "IS

EXAGGERATING AND FAKING HIS SYMPTOMS TO AVOID CRIMINAL

RESPONSIBILITY."  Dkt. #113 at 68-69. (Req. for Jud. Not. Ex. A at 53-54).  108.  Plaintiff

was convicted on September 7, 2005.  109. Neither defendant Martin, defendant Kopec, nor

non-party Lieutenant Wright (defendant Martin's direct supervisor during the extraction) can

recall whether they knew, at the time of the extraction, of plaintiff's assault on a correctional staff

person the day before the cell extraction.  110. Wright has no current recollection of plaintiff's

assault on a correctional staff person the day before the cell extraction, but was the hearing

officer for the disciplinary charge concerning the violation.  112.  Officer Spidle, the control

booth operator who handed the munitions to defendant Martin no longer recalls: (1) why the cell

extraction was ordered; (2) how he found out about the extraction; (2) any of the events leading

up to the extraction (other than that he gave defendant Martin the munitions); (3) how many or

which type of munitions he provided; (4) how many times he reached through the control booth

---

[6] Plaintiff states that in the same document defendants cite have cited, doctors state that Mr. Graham "readily admits that he experiences auditory hallucinations."  Dkt. # 113 at 68, citing Ganson Dec. Ex. C (Medical Records at Med-009).  In their reply to the response, defendants again cite to the uncontested holding at the criminal court which determined plaintiff to be "exaggerating and faking his symptoms to avoid criminal responsibility," citing Lujan, and contending plaintiff's response to be irrelevant.  Reply to rsp to DUF 103.

[7] Plaintiff states that in the same section of the medical records defendants have cited here, doctors report that plaintiff claimed he was going to be rescued from Patton State Hospital "by the Taliban." (Ganson Decl. Ex. C (Medical Records at Med-005). Dkt. # 113 at 68. Defendants repeat their protest of this response based on the same basis noted in the prior footnote.

window to hand the munitions down; (5) whether the writing on the side of the rounds had rubbed off; or (6) whether he told defendant Martin that he had been unable to hear which munitions defendant Martin requested and therefore was providing "a little of everything." 113. Even after reviewing his report regarding the incident, Spidle could not recall many of the observations he made during and immediately following the extraction. 114. Wright cannot recall why they decided to use the T-21 round or the launcher for the extraction, whether he watched defendant Martin load the launcher, whether he examined the spent 40B stinger round, whether he was personally involved in any investigation of defendant Martin's use of the 40B stinger, or whether he heard the disciplinary rules violation reports resulting from plaintiff's conduct that led to the extraction. 115. Officer Campa, could not recall discovering the broken sprinkler in plaintiff's cell. 116. Campa, who participated in the extraction and was present when the rounds were deployed, cannot recall whether he saw defendant Martin load or discharge the launcher, or where plaintiff was located in the cell during the extraction. 117. When asked about the cell extraction procedures in effect in 2001, Campa responded, "Like I said 2001 I can't remember that far, honestly . . ." (Campa Dep. 79:20-80:11.) 118. After reviewing his report from the cell extraction, Campa still could not recall being present when the rounds were deployed, or the reason for the extraction. 122. At deposition, plaintiff no longer could recall whether the medical personnel he spoke to before the extraction was a "MTA, psych tech, psychiatrist, psychologist, anything." (Pl.'s Dep. 86:21-25.) 125. At deposition, plaintiff no longer could recall filing the previous lawsuit regarding his extraction. (Pl.'s Dep. 26:3-7). Dkt. # 107, pp. 43-6; dkt. # 13, 38-72.

The following of plaintiff's undisputed facts are expressly undisputed by defendants with any caveat noted. PUF 3. Operational Procedure 118 concerning cell extractions was in effect at HDSP on Dec. 20, 2001. PUF 6. In December 2001, OP 118 did not permit the use of a 40mm launcher in cell extractions. Dkt # 116-4, p. 41, citing Ex. 12 (OP 118 at 4). Although defendants admit this, they observe that "this fact is inherently misleading"

1   because OP 118 neither addresses or disallows use of the 40mm launcher.  Rsp to PUF 6, citing

2   id., and Declaration of Bloem.[8]  PUF 9. Defendant Captain Kopec did not physically view

3   plaintiff's Dec. 20, 2001 cell extraction.  PUF 12.  MTA Barton's examination of plaintiff after

4   the Dec. 20, 2001 cell extraction lasted less than one minute.

5                    *Parties' Requests for Judicial Notice*

6                    In support of their motion for summary judgment, defendants ask the court to take

7   judicial notice of People v. Graham, Los Angeles Superior Court, Case No. LA-043100-01

8   (Exhibit A) and Graham v. Runnels, No. 2: 02-cv-1592 FCD PAN (E.D. Cal. ) and docket # 16

9   (Ex. B) (judgment entered on dismissal without prejudice of that case on March 16, 2004).

10  Request at docket # 98.  Further, defendants ask the court to take judicial notice of the following

11  facts in the state court case: 1) plaintiff was arrested for multiple felony state law violations

12  committed on May 13, 2003 (Ex. A at 0024); 2) plaintiff's mental competence was challenged on

13  February 19, 2004 (Ex. A at 0087); 3) plaintiff's challenge to the certificate of mental

14  competence was held in Los Angeles criminal court (Ex. at 53-54); 4) the court denied the mental

15  competency challenge, expressly holding that plaintiff "IS EXAGGERATING AND FAKING

16  HIS SYMPTOMS TO AVOID CRIMINAL RESPONSIBILTY" (Ex. A at 53-54); 5) plaintiff

17  was convicted on September 7, 2005 (Ex. A at 69-70).  Id.

18                    As to Graham v. Runnels, No. 2:02-cv-1592, filed on July 26, 2002, and

19  dismissed, on March 16, 2004, for failure to prosecute, defendants seek judicial notice of the

20  case, wherein they contend the same claims were raised as those at issue herein.   Docket # 98.

21  In particular, defendants seek judicial notice of plaintiff's representation in that case to the court

22  on September 29, 2006, that he was "in the process of refiling the case," arguing that these facts

23  are relevant to the determination as to whether the statute was tolled and this action was filed

24  timely.  Id.

25

26          [8] This issue is addressed further in the discussion regarding defendant Kopec.

1    In support of his opposition to the motion for summary judgment, plaintiff, in

2  turn, seeks judicial notice of the following docket entries of <u>Graham v. Runnels</u>, No.

3  2:02-cv-01592 FCD PAN: docket # 13,  # 14 and # 15.  Docket # 105, Exs. A, B & C.  These

4  docket entries include a show cause order, filed on Nov. 26, 2003, noting that the court had

5  found plaintiff had stated a colorable claim against defendant Martin, also observing that plaintiff

6  had failed to submit the requisite papers for service of the defendant.  2:02-cv-1592, docket # 13.

7  Plaintiff was given additional time to respond.  <u>Id</u>.  In docket # 14 of that case, it was

8  recommended, by filing dated Jan. 29. 2004, that the action be dismissed without prejudice, the

9  court finding therein that defendant had not been served pursuant to Fed. R. Civ. P. 4(m) and that

10  plaintiff had failed to offer any explanation for failing to submit papers for service.  In docket #

11  15 of 2:02-cv-01592, by order filed on March 16, 2004, the findings and recommendations at

12  docket # 14 were adopted in full and the case dismissed without prejudice.

13    Under Fed. R. Evid. 201(b), a court may take judicial notice of a fact not subject

14  to reasonable dispute, either because the fact is generally known within the territorial jurisdiction

15  of the trial court or because the fact is capable of accurate and ready determination from sources

16  whose accuracy cannot be reasonably questioned.  Pursuant to Fed. R. Evid. 201(c), a court may,

17  on its own, take judicial notice of an adjudicative fact or "must take judicial notice if a party

18  requests it and the court is supplied with the necessary information."

19    While documents that are public records may be judicially noticed for the purpose

20  of showing the occurrence of a judicial proceeding that a particular document was filed in a

21  separate court case, or that a specific fact was found, judicial notice for the truth of the findings

22  of facts from another case is not appropriate.  <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1114 n. 5 (9th

23  Cir. 2003) ('[f]actual findings in one case ordinarily not admissible for their truth in another case

24  through judicial notice"); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001) (while

25  court may take judicial notice of "matters of public record," it may not take judicial notice of any

26  fact "subject to reasonable dispute"); <u>United States v. Jones</u>, 29 F.3d 1549, 1553 (11th Cir. 1994)

1   ("a court may take notice of another court's order only for the limited purpose of recognizing the

2   'judicial act' that the order represents or the subject matter of the litigation").   The court will

3   grant both parties requests' for judicial notice of the documents submitted on the basis that a

4   court may take judicial notice of court records, <u>Barron v. Reich,</u> 13 F.3d 1370, 1377 (9th Cir.

5   1994); <u>MGIC Indem. Co. v. Weisman</u>, 803 F.2d 500, 505 (9th Cir. 1986); <u>United States v.</u>

6   <u>Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980), and not for the truth of the matter therein asserted.

7        *Statute of Limitations*

8             On December 7, 2002, plaintiff was released on parole.   On July 26, 2002,

9   plaintiff filed case no. 2:02-cv-01592 ("previous action").   The previous action, which involved

10   the same claims as this action, was dismissed without prejudice on March 16, 2004, before the

11   Court effected service.   On Sept. 29, 2006, plaintiff indicated he was refiling this action;

12   however, plaintiff did not file this action until Sept. 17, 2007.   The complaint originally filed in

13   this action contains a single paragraph containing the allegations underlying plaintiff's Eighth

14   Amendment claim.

15             Evidently paroled after the 2002 incident, plaintiff was arrested for multiple

16   felony state law violations committed on May 13, 2003.   Plaintiff was admitted, on Sept. 15,

17   2003, to Patton State Hospital.   Patton State Hospital staff discharged plaintiff back to court on

18   Nov. 10, 2003.   On Feb. 19, 2004, plaintiff's mental competence was again challenged.   On Sept.

19   13, 2004, plaintiff again was admitted to Patton State Hospital.   Upon his admission, a Patton

20   psychiatrist observed that plaintiff "may be malingering," noting that plaintiff "mentally appears

21   alert, although he presents himself as someone who is hallucinating and is delusional." (Medical

22   Records at Med. -011).[9]   The medical notes state: "There seems to be a selective loss for recent

23   and remote events depending on what information he wants to be told or provide."   (Medical

24   _____

25        [9] Plaintiff asserts that in the same document cited by defendants, staff psychiatrist
    Boniface Dy, M.D., diagnosed plaintiff as having "psychotic disorder" and ordered a treatment
26   plan focusing on hallucinations.   Docket # 113, p. 68, citing Ganson Declaration, Ex. C (Medical
    Records at Med. -010-11).

1   Records at Med-009).[10]  The medical notes indicate that it seemed plaintiff could fully

2   understand the questions asked of him. (Medical Records at Med.-009).[11]  The medical notes

3   indicate that although plaintiff "expressed his delusions and hallucinations," he also "was

4   observed to be interacting very well with other patients," and "spoke logically with good

5   association of ideas." (Medical Records at Med.-005).[12]  On November 8, 2004, plaintiff again

6   was determined to be competent and was discharged back to court. (Medical Records at

7   Med.-004, 005).  On July 13, 2005, plaintiff's challenge to the certificate of mental competence

8   was held in the Los Angeles criminal court.   The court denied the challenge to mental

9   competency, and expressly held that that plaintiff  "IS EXAGGERATING AND FAKING HIS

10   SYMPTOMS TO AVOID CRIMINAL RESPONSIBILITY."  Dkt. # 13 at 68-69. (Req. for Jud.

11   Not. Ex. A at 53-54).  Plaintiff was convicted on September 7, 2005.

12          The undersigned does not elect to re-litigate this ground raised by defendants in a

13   successive motion, seeking once again for the court to find this action time-barred.

14          In an order filed on September 14, 2009, defendants' motion to dismiss the

15   complaint as time-barred was denied.  In the August 4, 2009, findings and recommendations

16   adopted in full by that order, the court found that plaintiff had raised a genuine issue of material

17   fact as to whether he meets the requirements for equitable tolling (defendants' motion to dismiss

18   having been converted, by plaintiff's reliance on equitable tolling, to a motion for summary

19   judgment).

20

21          [10] In the same document that defendants cite here, doctors state that plaintiff's speech
     is "rambling" and that he accused hospital staff of "tak[ing] his blood in order to clone
22   him."  Dkt. # 113 at 68, citing Ganson Dec. Ex. C (Medical Records at Med-009).)

23          [11] In the same document that defendants cite here, doctors state that Mr. Graham "readily
     admits that he experiences auditory hallucinations."  Dkt. # 113 at 68, citing Ganson Dec. Ex. C
24   (Medical Records at Med-009).

25          [12] In the same section of the medical records that defendants cite here, doctors report that
     plaintiff claimed he was going to be rescued from Patton State Hospital "by the Taliban."
26   (Ganson Decl. Ex. C (Medical Records at Med-005).  Dkt. # 113 at 68.

Thus, whether construed as pursuant to the statute for a mental disability or under a judge-made equitable tolling doctrine, what must be calculated is the period of time during which plaintiff can show he was mentally incompetent and could not file timely, which becomes important to determine when the statute of limitations may have stopped running.  If, for example, plaintiff can prove that he was mentally incompetent for two entire years before December 20, 2005, the end of the statutory limitations period as maintained by defendants, then plaintiff's September 17, 2007, filing would be timely.  Plaintiff has provided at least prima facie evidence of mental incompetence for the period of time from July 17, 2003, until March 1, 2005, raising a triable issue of fact for a jury to determine whether plaintiff is entitled either to tolling under the applicable statute or to equitable tolling.

Findings and Recommendations, filed Aug. 4, 2009, p. 13 (adopted on Sept. 14, 2009).

Defendants argue that they were not afforded an opportunity to respond once the court found that defendants' prior motion to dismiss had been coverted into one for summary judgment in light of plaintiff pro se's having provided prima facie evidence of mental incompetence for the period from July 17, 2003, until March 1, 2005, raising a triable issue of fact for a jury to determine plaintiff's entitlement to tolling under Cal. Code Civ. P. § 352(a) or to equitable tolling.  Defendants also contend that plaintiff did not fully disclose all the evidence for the period at issue, thus this court was misled.

The undersigned is not persuaded.  Unless the court affirmatively excludes extra-record material set forth in an opposition to a motion, the motion to dismiss "must" be transformed into a motion for summary judgment.  Fed. R.Civ. P. 12 (d).  Defendants were certainly on notice that when plaintiff submitted his factual material, they were required to respond in kind within the reply, unless the court had ruled otherwise.  At the very least, defendant should have submitted an inquiry, request for extension for the reply, or the like if they had any doubts about the need to reply with factual information.  Moreover, defendants did not file objections to the findings and recommendations recommending denial of the motion to dismiss in which they could have requested to add the factual material.  Further, defendants did not seek reconsideration of the order once the findings and recommendations were adopted.  Finally, within the now-vacated initial motion for summary judgment brought while plaintiff was

1    still proceeding pro se, the statute of limitations was not even raised as a ground for summary

2    judgment.

3              Law of the case, while not an inexorable preclusion of successive motions, serves

4    an important principle in litigation which prevent endless motions refining and re-refining one's

5    theories or evidentiary submissions.  United States v. Cuddy, 147 F.3d 1111, 1114 (9th Cir.

6    1998).  The doctrine applies to the decision of a higher court as well as decisions of the same

7    court.  Id.  Absent clear error or changed circumstances, such as a change in the law, the decision

8    should not be changed.  United States v. Estrada-Lucas, 651 F.2d 1261, 1263-64 (9th Cir. 1980).

9    As explained above, the circumstances surrounding defendants' presentation of the first motion

10   regarding the statute of limitations does not weigh in favor of giving defendants a second motion

11   on the subject.[13]

12             Nevertheless, the failure to obtain a summary judgment on the issue, after the

13   initial motion to dismiss was converted to a motion for summary judgment by operation of law,

14   does not preclude presentation of the issue as one for the trier of fact to decide.  The first ruling

15   was simply a finding that material issues of fact existed which precluded judgment as a matter of

16   law.  The statute of limitations defense will ultimately and dispositively be made by the trier of

17   fact at trial.

18             *Laches*

19             As plaintiff notes, defendants failed to plead laches in their answer and also that

20   laches is an equitable defense where plaintiff herein seeks only money damages.

21             Federal and Montana law recognize that laches is an equitable
               defense to a civil action.  *Grand Canyon Trust v. Tucson Elec.*

22             *Power Co.*, 391 F.3d 979, 987 (9th Cir.2004); *Hunter v. Rosebud
               County*, 240 Mont. 194, 783 P.2d 927, 930 (1989).   An action like

23             Floyd's, alleging a breach of contract, however, is an action at law.
               See *State ex rel. Butte Youth Serv. Ctr. v. Murray*, 170 Mont. 171,

24

25             [13]Moreover, even if all the evidence were to be presented on the issue, the existence of an
       issue of fact, however tenuous from plaintiff's standpoint, is apparent and precludes summary

26     judgment.

                                              16

> 551 P.2d 1017, 1019 (1976) (distinguishing between remedy at law for breach of contract and remedy in equity for specific performance).  Therefore the doctrine of laches poses no barrier to Floyd's claim.  See *Wyler Summit P'ship v. Turner Broad. Sys.*, 235 F.3d 1184, 1193-94 (9th Cir.2000) (holding that breach of contract claim seeking money damages was an action at law that precluded defense of laches); *Miller v. Maxwell's Int'l*, 991 F.2d 583, 586 (9th Cir.1993) (holding that the doctrine of laches is inapplicable when statute of limitations governs an action)."

Floyd v. Oliverson, 389 Fed.Appx. 641unpub (9th Cir. 2010).[14]  Plaintiff cites Ivani Contracting Corp. v. City of New York, 103 F.3d 257 (2d Cir. 1997) (reversing dismissal based on laches because complaint sought damages under § 1983).  Dkt # 113, p. 32.  In that case, the Second Circuit stated that the Supreme Court had long determined that "'[l]aches within the term of the statute of limitations is no defense at law'" (at 259) and that laches could not bar an action "otherwise timely filed under § 1983's three-year limitations period as borrowed from analogous state law." Ivani at 262.  Defendants argue that plaintiff's reliance on the Second Circuit case ignores Ninth Circuit precedent finding that laches can bar even a claim for damages that is timely under the statute, citing two Ninth Circuit cases finding laches to be a defense to claims of copyright infringement, Danjaq LLC v. Sony Corp., 263 F.3d 942, 949, 954, 963 (9th Cir. 2001) and to Lanham Act claims for money damages, Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 840 (9th Cir. 2002).  Reply, p. 20.  However, in both of these cases, laches is recognized to be an equitable defense.

> Laches, an equitable defense, is distinct from the statute of limitations, a creature of law.  E.g., *Jackson,* 25 F.3d at 888.  Statutes of limitation generally are limited to actions at law and therefore inapplicable to equitable causes of action.  E.g., *Patton v. Bearden,* 8 F.3d 343, 347 (6th Cir.1993).  Laches serves as the counterpart to the statute of limitations, barring untimely *equitable* causes of action.  E.g., *Jackson,* 25 F.3d at 888.

Jarrow Formulas, 304 F.3d at 835 (emphasis added).

---

[14] Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007.  Ninth Circuit Rule 36-3.  Although still not precedential in the binding sense, the unpublished decisions do have a certain amount of persuasive value, and indicate how Ninth Circuit judges apply binding precedent.

1    The laches argument fails in this § 1983 context.

2           *Exhaustion of Administrative Remedies*

3           The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) provides that,

4    "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any

5    other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

6    such administrative remedies as are available are exhausted."  Inmates seeking injunctive relief

7    must exhaust administrative remedies.  Rumbles v. Hill, 182 F.3d 1064 (9th Cir. 1999).  In Booth

8    v. Churner, 532 U.S. 731,741, 121 S. Ct. 1819, 1825 (2001), the Supreme Court held that

9    inmates must exhaust administrative remedies, regardless of the relief offered through

10   administrative procedures.  Therefore, inmates seeking money damages must also completely

11   exhaust their administrative remedies.  Booth v. Churner, 532 U.S. 731, 121 S. Ct. 1819 (inmates

12   seeking money damages are required to exhaust administrative remedies even where the

13   grievance process does not permit awards of money damages).   The United States Supreme

14   Court has held that exhaustion of administrative remedies under the PLRA requires that the

15   prisoner complete the administrative review process in accordance with the applicable procedural

16   rules.  Woodford v. Ngo, 548 U.S. 81, 126 S. Ct. 2378 (2006).  Thus, the PLRA exhaustion

17   requirement can only be satisfied by "proper exhaustion of administrative remedies....," which

18   means that a prisoner cannot satisfy the requirement "by filing an untimely or otherwise

19   procedurally defective administrative grievance or appeal."  Woodford v. Ngo, supra, at 84, 126

20   S. Ct. at 2382.   Defendants, however, "have the burden of raising and proving the absence of

21   exhaustion."  Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).

22          It is undisputed that the only grievance plaintiff filed which could be found to

23   address his claim that excessive force was used during his December 20, 2001, cell extraction, is

24   HDSP-S-02-00689, which was submitted on April 4, 2002.  It is also undisputed that the

25   grievance does not name defendant Kopec.

26   \\\\\

1    Defendants contend that plaintiff's administrative grievance was untimely because

2  it was filed beyond the fifteen working day limit to file an inmate grievance, which would have

3  been by January 10, 2002, given the Dec. 20, 2001, date of the cell extraction.  MSJ, p. 34, citing,

4  inter alia, CAL. CODE REGS. tit.xv, §§ 3084.2(c), 3084.6(c).  Plaintiff avers that he was on crisis bed

5  status at HDSP from Dec. 20, 2001 through Jan. 9, 2002, and again before March 12, 2002, as

6  well as on crisis bed status at SVSP from March 12, 2002 through March 25, 2002, and

7  implicates a lack of access to writing implements, paper, and the law library while plaintiff was

8  on crisis bed status, while defendants object that these statements framed as undisputed by

9  plaintiff are, inter alia, irrelevant because plaintiff was able to file grievance by April of 2002.

10  Opp., docket # 113, p. 73, citing plaintiff's declaration at ¶¶ 27-, 28, 31 and Exs. 9, 15-16, 18;

11  Reply # 116-4, p. 43.  Of course, however, the statements by plaintiff are highly relevant to the

12  question of whether plaintiff could have filed an inmate grievance within the 15-day time limit

13  for which the grievance was rejected at the third level.  See below.  In their reply, defendants cite

14  an additional grievance, SVSP-A-02-01108, plaintiff submitted protesting his ad seg placement

15  at Salinas Valley State Prison, SVSP-A-02-01108, on February 28, 2002, and re-submitted on

16  March 10, 2002, showing he had access to the grievance system before April of 2002.  Reply,

17  docket # 116-4, p. 98, citing custodian of records dec. ¶ 4 (docket # 109) & Ex. A.  The court

18  observes that it appears that plaintiff's first attempt at filing this grievance resulted in its being

19  rejected (on March 4, 2002) for his having failed to complete the form adequately or for having

20  failed to attach the appropriate documents and for his failure to sign and date the appropriate

21  section.  Docket # 109-1, p. 10.  Plaintiff had been  returned to HDSP prior to the late first level

22  appeal response in the form of a partial grant on May 10, 2002, by SVSP, the partial grant being

23  so construed because plaintiff's housing issues were to be determined at HDSP.  Id., at 4-5.

24    The grievance at issue herein, HDSP-S-02-00689, wherein plaintiff complained

25  that he suffered migraines, blurry vision, suicidal thoughts, dizziness, memory loss and periodic

26  blackouts as a result of defendant Martin's discharge of the 40B stinger that hit him on the left

side of his head was bypassed to the second level and received a substantive response, in the
form of being "partially granted."  MSJ, Ex. I, Declaration of J. Delaney (CDCR SVSP litigation
coordinator & Delaney Ex. A); Reply, docket # 116, p. 90-92.  Defendants include a copy of the
June 4, 2002, letter from the Inmate Appeals Branch (or third level) stating that plaintiff's
documents were being returned to him for his failure to have filed the appeal within 15 days of
the incident.   MSJ, Ex. O, citing docket # 1 (plaintiff's original but not operative complaint
which included a copy of the June, 4, 2002 letter, as well as the other appeal documents for this
grievance); Reply, at 89.  Defendants include, Ex. H to their MSJ, Declaration of D. Foston
(CDCR Chief of Inmate Appeals Branch), ¶¶ 6-7, attesting to the grievance's not having been
accepted for review at the Director's level because it was screened out as untimely because it was
not filed within fifteen days of the incident.   Plaintiff bases his contention that defendants cannot
meet their burden to show that his administrative appeal did not reach the Director's level of
review on his objection to the supporting evidence as inadmissible.  Opp., p. 33.  Plaintiff objects
that the screen-out letter is not authenticated, citing Fed. R. Evid. 901(a); that declarant Foston
has improperly speculated as to the basis for the appeal's not having been accepted at the
Director's level by a purported review of CDCR files, but does not attest to CDCR's practices
and procedures in the maintenance of such records such that such a conclusion could be properly
drawn.  Id. at 78.  Plaintiff also objects that the best evidence rule (Fed. R. Evid. 1002) requires
the submission of an original writing to prove its content whereas defendants seek to use the
Foston Dec. to both prove the content of the writing and the basis of the screen out without
attaching the document itself.  Id. at 77.   As to this point, defendants make cogent points in
contending that the screen-out letter was attached to the verified original complaint, that the letter
itself supplies the reasons for the return of the appeal, and that defendant Foston's declaration is
offered not to prove the contents of the letter but the information contained in the files of the
Inmate Appeals Branch.  Reply, docket # 116-4, pp. 16-17.

\\\\\

Plaintiff argues that acceptance of the grievance at the second level along with partially granting it, resulted in waiver by the prison to reject his appeal at the Director's level, citing several out-of-circuit cases in support of this proposition, which defendants aver contradict the controlling authority.  Opp., p. 35; Reply, p. 60.   Defendants cite the generally, controlling legal authority of Woodford v. Ngo, 548 U.S. at 90-91, 126 S. Ct. 2378, describing "proper exhaustion" as "compliance with an agency's [i.e., a prison's] deadlines and other critical procedural rules" and Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910 (2007), specifying that "it is the prison requirements, not the PLRA, that define the boundaries of proper exhaustion." Defendants point out that two of the three cases cited by plaintiff in favor of finding a waiver, Patel v. Fleming, 415 F.3d 1105, 1111 (10th Cir. 2005), and Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002), predate the ruling of Woodford v. Ngo and contends that the discussion in the third, Ellison v. N.H. Dep't. of Corr., 2009 WL 424535 at *4 n. 6  (D.N.H. February 19, 2009), regarding the question of whether an institution has waived its right to argue a failure to exhaust when a late-filed grievance has been considered by the prison on the merits, is only dicta.  Reply, pp. 60-61.  Defendants also argue that the second level review was partially granted only to the extent an investigation into his claims was completed.  Reply, p. 61, citing MSJ, Delaney Dec, Ex. A).  However, plaintiff also sought monetary compensation and a letter of reprimand for the officers who had been involved in the extraction.  Reply, p. 61.

All of the above back and forth ignores what this court finds as specifically controlling precedent, Brown v. Valoff, 422 F.3d 926 (9th Cir. 2005).  The court held that a staff misconduct complaint was exhausted, and one need not even file a third level appeal, once the grievance was "partially granted" at the second level, and that an investigation into the staff misconduct had been completed.  "We conclude, as have these other circuits, that a prisoner need not press on to exhaust further levels of review once he has either received all "available" remedies at an intermediate level of review or been reliably informed by an administrator that no remedies are available." Id. at 935 (emphasis added).  The Brown decision went on to find in one

1   of the two situations before it the Brown case, that with respect to a staff misconduct complaint,

2   once an investigation was completed, there were no further "available" remedies – even where

3   monetary relief been initially requested.  Id. at 937-940.

4          One difference between the Brown case and this one is that the second level

5   decision in Brown advised that there was no further review, and in this case, plaintiff was

6   advised that he could proceed to the third level (even though plaintiff's grievance involved staff

7   misconduct only).  The inconsistent review advice highlights the esoteric nature to which the

8   exhaustion process has arrived, where even prison officials may be confused as to what

9   constitutes further levels of review.  The advice-of-further-review situation was seized upon in

10  Cunningham v. Ramos, 2011 WL 3419503 (N.D. Cal. 2011), as distinguishing its situation from

11  the one in Brown.  However, Cunningham did not focus on the *alternative* language in Brown

12  quoted above, i.e., that when no further remedies actually exist, exhaustion to the third level is

13  not required.  The case here did not involve any separate claim apart from staff misconduct, and

14  according to Brown, it is *defendants'* burden to show the existence of further "available"

15  remedies which might exist at the third level.  Brown at 937.

16         This case also involves the rather unusual situation where the second level was

17  decided on the merits, and the [unnecessary] third level, and apparently without giving plaintiff

18  an opportunity to be heard, *sua sponte* determined that the first level appeal was untimely.

19  However, the undersigned will stick with what he understands to be the governing law in Brown.

20  In the staff misconduct context, unless defendant demonstrates what further remedies are

21  available at the third level, exhaustion is complete at the second level when the grievance is

22  partially granted, and the decision to investigate is at an end.

23         Moreover, and in any event, even if Brown were to be determined as not

24  controlling, the issue of whether equitable tolling would apply to plaintiff's first level grievance

25  is not one that can be decided at this time as material issues of fact exist concerning plaintiff's

26  ability to file within the determinative period.

1    Defendant Kopec argues that the claim was not exhausted as to him because his

2    name was not referenced; however, since the parties agree that it is undisputed that defendant

3    Kopec authorized the cell extraction, it appears that to the extent plaintiff has raised a genuine

4    issue of material fact with regard to whether this claim was administratively exhausted as to the

5    specifically named defendant Martin, plaintiff has arguably sufficiently raised such an issue with

6    respect to defendant Kopec.  The Supreme Court has made clear that what is required to exhaust

7    a prison's administrative grievance process is the level of detail a prison procedure requires for

8    exhaustion of a particular system or claim.  Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910,

9    923 (2007) (court's imposition of a requirement of naming a particular official in a grievance is

10   unwarranted where prison procedure does not mention it); Griffin v. Arpaio, 557 F. 3d 1117,

11   1120 (9th Cir. 2009) ("the primary purpose of a grievance is to alert the prison to a problem and

12   facilitate its resolution, not to lay groundwork for litigation.").  Here, where plaintiff's grievance

13   provides the basis for the gravamen of his complaint as to defendant Martin, his failure to

14   specifically name defendant Kopec, who authorized the cell extraction, does not result in a

15   finding of a failure to exhaust.

16                  *Application of Heck-bar*

17   Defendants argument that plaintiff's claim of excessive force is barred by Heck v.

18   Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994), is unavailing.  Under Heck v. Humphrey, a

19   state prisoner proceeding on an action under §1983 cannot recover money damages if a judgment

20   favorable for plaintiff "'would necessarily imply the invalidity of his conviction or sentence. . .

21   unles the plaintiff can demonstrate that the conviction or sentence has already been invalidated.'"

22   Guerrero v. Gates, 442 F.3d 697 (9th Cir. 2006), quoting Heck, 512 U.S. at 487, 114 S. Ct. [at

23   2372].  In Guerrero, the Ninth Circuit, while finding a number of plaintiff Guerrero's claims

24   Heck-barred, said of his claims for excessive force against defendants that they were not such as

25   to necessarily implicate the validity of his conviction because "[t]he officers' alleged use of

26   excessive force during Guerrero's arrest does not preclude the possibility that Guerrero was still

23

1   guilty of possession of narcotics." Id., at 703; see also, Smith v. City of Hemet, 394 F.3d 689

2   (9th Cir.2005) (en banc)(excessive force claim not Heck-barred where claim arose from action

3   subsequent to conduct on which conviction for willfully resisting, delaying or obstructing officer

4   was based); Ove v. Gwinn, 264 F.3d 817 (9th Cir. 2001)(although dismissed on alternative

5   grounds, plaintiffs' claim regarding the manner of the blood draw did not implicate plaintiffs'

6   DUI convictions and thus were not Heck-barred); (Smithart v. Towery, 79 F.3d 951 (9th Cir.

7   1996) (prisoner's excessive force claim during arrest not barred by Heck even though his assault

8   with a deadly weapon conviction had not been overturned).   Thus, the instant plaintiff's having

9   been shot with a 40B stinger round during a cell extraction, the gravamen of this action,[15] does

10  not, as defendants argue, implicate his disciplinary conviction and loss of good time credits for

11  breaking a sprinkler and requiring the cell extraction itself.   Accordingly, summary judgment on

12  this basis must be denied.

13              *Eighth Amendment/Qualified Immunity*

14              Defendant Martin

15              Plaintiff alleges in his verified first amended complaint, filed on May 21, 2008,

16  that, while he was single-celled in the High Desert State Prison Ad Seg unit on December 20,

17  2001, he refused to submit to hand cuffs when ordered to do so, after which a cell extraction

18  team was formed.  First Amended Complaint (FAC), p. 3.  Defendant Martin is alleged to have

19  discharged a 40B stinger round during the cell extraction of plaintiff, followed by a T-21. O.C.

20

---

21              [15] See MSJ (docket # 107-1), plaintiff's deposition 68: 9-24.
            "Q. Okay.  Tell me specifically in your own words ... what did defendant Martin
22  do that you believe is excessive force on December 20, 2001?
            A. He utilized the 40B stinger.
23          Q. Okay, so you believe that utilizing the stinger was excessive force?
            A. Utilizing the 40B stinger in the cell was excessive force.
24          Q. What about the use of pepper or OC spray?
            A. This doesn't have nothing to do with it.  It's the 40B stinger that he utilized that
25  made it excessive force."
            Q. Okay.  It wasn't the spray, it was specifically the 40B stinger, correct?
26          A. Yes."

discharge.  Id.   The 40B stinger round is claimed to have struck plaintiff "on the left side of the head, causing immediate swelling."  Id., at 3-4.  Defendant Martin, undisputedly a sergeant at HDSP at the relevant time, contends that his unauthorized use of the 40B stinger round was not intentional and did not constitute excessive force.

"[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7,112 S. Ct. 995, 999 (1992), citing Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078 (1986).  When determining whether the force was excessive, we look to the "extent of the injury..., the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Hudson, supra, at 7, 112 S. Ct. at 999.

While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, supra, at 9, 112 S. Ct. at 1000, citing Whitley, at 327, 106 S.Ct., at 1088.

It is undisputed that plaintiff broke the fire suppression sprinkler in the HDSP Ad Seg unit where he was single-celled on December 20, 2001; that defendant Martin instructed plaintiff to submit to handcuffs and exit the cell so that maintenance staff could repair the sprinkler head; that plaintiff refused to comply with defendant Martin's order; that a tactical extraction team was authorized to remove plaintiff from his cell; that launchers and munitions were stored in the control booth; that defendant Martin, following a common practice, yelled to the control booth operator, Officer Spidle, and Spidle came to the control booth window, with Martin requesting a 40 mm launcher; that defendant Martin had worked with Officer Spidle

before, did not know him to be careless, had no reason to believe he was not fully competent, and trusted him; that Officer Spidle handed defendant Martin a 40 mm launcher and a handful of rounds through the "window" in the floor of the control booth; that Officer Spidle did not indicate to defendant Martin that he had been unable to hear which rounds he requested, or that he was providing defendant Martin any rounds other than the T-21 blast dispersion rounds; that the 40 mm launcher is a less-lethal weapon that was used to deploy both T-21 blast dispersion rounds and 40B stinger rounds.  Defendant Martin's direct supervisor, Lieutenant Wright, was present during the cell extraction.  Plaintiff was issued the Calculated Use of Force Advisement, ordered to submit to handcuffs and exit the cell, instructed that if he failed to obey the order he would be physically removed from the cell, and warned that physical force might be used to facilitate his removal from the cell, but plaintiff did not comply, instead wrapping himself in a blanket and getting under a table at the back of the cell.  Force was determined to be necessary to remove plaintiff from the cell.  Using the 40mm launcher, defendant Martin deployed a 40B stinger round into plaintiff's cell (a 40B stinger round is a munition which contained small rubber balls).  While it is not in dispute that the first round defendant Martin fired was the unauthorized 40B stinger round, what remains at issue with respect to this deployment is what constitutes the gravamen of this action.  Defendant Martin maintains that shooting the 40B stinger round was an accident, see, e.g., defendant Martin's declaration:

> I loaded the 40 mm launcher with what I believed was a T-21 blast dispersion round ......  The sound the round made upon discharge alerted me that I had inadvertently deployed a 40B round rather than a T-21 blast dispersion round.  Until the round was deployed, I did not know that I had any 40B stinger rounds in my possession. I immediately discussed the error with Lieutenant Wright.... I did not act maliciously or sadistically.  Nor did I intend to cause Graham any harm.  At the time of the cell extraction, I was not mad at Graham.

Ex. A, to MSJ (docket # 107), Declaration of defendant Martin, ¶¶ 27, 32-34, 46-47.  In addition, in an 837C supplement to crime/incident report made dated the same day as the incident on Dec. 20, 2001, defendant Martin stated with regard to discharging the stinger round:

1
2
3

> I then discharged what I thought to be one 40 m/m T-21, O.C.
> round through the food port toward the back wall of the cell.  After
> discharge I did not observe any O.C. within the cell, and I observed
> small round balls rolling on the floor.  It was at this time that I
> realized that I had inadvertently discharged a 40B-Stinger Round.

4   Opposition (Opp.) (docket # 113-2), attachment to defendant Martin's deposition, Ex. 4, p. 47.

5           Plaintiff, on the other hand, declares that defendant Martin, in the morning on the

6   same day as the incident at issue, but prior to it, told plaintiff that he knew about an incident that

7   had allegedly occurred the day before, on December 19, 2001, wherein plaintiff was accused of

8   "head-butting" a guard and informed plaintiff "that he does not tolerate his guards being treated

9   like that."  Opp. (# 113-8), plaintiff's Dec., ¶¶ 3, 8.  Plaintiff contends that defendant Martin was

10  angry at plaintiff for the alleged headbutting of a colleague the day before and that twice before

11  shooting, defendant Martin had threatened plaintiff, saying "he does not tolerate his guards being

12  treated like that" and he would have plaintiff "licking his own balls" by the end of the day.

13  Plaintiff's Declaration, ¶ 12.  Plaintiff vows that after he had broken the sprinkler head in his cell,

14  defendant Martin came back to plaintiff's cell, telling him "to cuff up so that the guards could fix

15  the broken sprinkler," which plaintiff avers that he refused to do because he "was scared of what

16  Martin and the other guards might do to me."  Id., at ¶ 11.  According to plaintiff, "Sergeant

17  Martin said they would have to come in and take me out of the cell.  He said by the end of the

18  day he would have me 'licking my own balls,'" which plaintiff took to mean "he intended to

19  cause me harm."  Id., at ¶ 12; see also, plaintiff's Dep. 85: 21-25 - 86:1-4 (wherein plaintiff

20  testifies defendant Martin told him that "by the end of the day, he will have me licking my own

21  nuts.").   Also other officers in the unit taunted plaintiff and warned him that he would have a

22  hard time there, making his food into a disgusting slop, according to plaintiff.  Id., at ¶¶ 6-7.

23  Further, plaintiff produces, in addition to other portions, that section of defendant Martin's

24  deposition wherein he attests that he had never before or after the subject incident accidentally

25  fired a stinger when he meant to fire an O.C. round and had never done the reverse, nor had he

26  ever heard of any such accidental firing by someone else.  Opp., defendant Martin Deposition,

1   Ex. 4, 59:4-21; see also, Lieutenant's Wright's deposition, wherein he attests to having been

2   present at more than a thousand cell extractions over his more than 23 years with CDCR and

3   testifies, that other than in this instance, he had never heard of an officer having fired one type of

4   round when intending to fire another.  Wright Dep. 27:13-15, 44:25-45:15.  Moreover, plaintiff

5   has produced evidence of the contrast in the markings and color of the 40B stinger round and the

6   T-21 O.C. blast dispersion round, to which accurate depiction defendant Martin and other

7   correctional officers attested.  Opp., (# 113-1) Declaration of Brendan Kelleher, ¶ 3, citing

8   plaintiff's Ex. 3 and deposition testimony of defendant Martin, Ex. 4, 47:11-[25], [48:1-17];

9   Deposition of Mike Wright,[16] Ex. 6, 58:20-[page 61]; Deposition of Anthony Campa, Ex. 7,

10   52:20-22, 54:2-3.  Although Mr. Campa indicated that he was not sure whether in December of

11   2001 all O.C. canisters were orange (Campa Dep. 53:16-23), Mr. Wright was definite that in

12   December 2001, a 40B stinger round had black writing while an O.C. round, had in his

13   experience, always been orange (Wright Dep. 61:13-25) (as was depicted in the photographs).

14   While plaintiff concedes that the shape and size of T-21 blast dispersion and 40B stinger casings

15   are similar, although the contents differ (see plaintiff's response to DUF no. 29), plaintiff argues

16   for the distinctiveness of the markings, i.e., the 40B stinger round is marked with a prominent

17   black label, "STINGER," while the O.C. rounds have the words "MUZZLE BLAST O.C." in

18   "fluorescent orange," making the use of the stinger round in place of the O.C. round less likely to

19   have been mistaken.  See Opp., plaintiff's undisputed facts (PUF) nos. 1 and 2, citing Kelleher

20   Dec. ¶ 3, defendants' set three discovery responses at Ex. 2; photographs of rounds at Ex. 3; and

21   Ex. 4, defendant Martin's Dep. 47:5-49:23.  In response to PUF nos. 1 & 2, defendants do not

22   dispute that the rounds were generally marked as described by plaintiff but object that the rounds

23

24       [16] The court is unable to locate either plaintiff's Ex. 5 (excerpts and exhibits from
     defendant Thomas Kopec's deposition) or Ex. 6 (plaintiff's excerpts and exhibits from Mike
25   Wright's deposition) to plaintiff's opposition in docket # 113.  Therefore, where these
     depositions are cited, the court has referenced the lodged deposition transcript of each of these
26   individuals.

at issue were unlikely to have been as clearly marked, citing defendant Martin's testimony that

writing can rub off the side of the canister from being moved around and hitting each other:

> Mr. Berry: Q. In your experience working with these types of
> rounds, did you ever see a round where the writing had rubbed off
> the side of the canister.
> [Martin] A.  Oh, yes.
> Q. Did that happen often?
> A.  Yes.  And it was just a - - it - - it was just from the process that
> is utilized.  They're inventoried, you know, three times a day,
> they're moved every day, and they hit each other and, yes, it - - the
> - - the writing gets pretty distorted, it's common.

Reply, pp. 119-20 (docket # 16-4, pp. 39-40); defendant Martin's lodged deposition testimony:

50:17-51:1.  Defendants also contend that the rounds provided to counsel for plaintiff for

photographing had not been stored in a control booth where labeling could have rubbed off.

Reply at 120, citing Opp., Ex. 2, defendants' response to request for production no. 1.

Notwithstanding, defendant Martin's own testimony tends to undermine the notion that the

identifying labeling might have been significantly rubbed off:

> Q. Did you look at the spent canister of the stinger round after you
> fired it?
> A.  Yes.
> Q. Did it have writing on the side?
> A.  I believe it did, yes.
> Q. What did the writing say?
> A.  Exactly what the round was.
> Q. Written in black?
> A.  Yes.
> Q. Had it been rubbed off?
> A.  I don't recall.  I - - I don't know.  But I - - I know I looked at it,
> and so it was legible.

Defendant Martin's Dep. 138:5-16.

The court finds that genuine issues of material fact have been raised by plaintiff,

regarding whether the 40B stinger round was launched as a form of retaliation and as the

culmination of threats plaintiff had received from defendant Martin as a result of a head-butting

incident from the day before between plaintiff and defendant Martin's colleague.  Moreover, the

level of difficulty in properly aiming the 40 mm launcher is disputed as well– if plaintiff's

1  version of the fact were to be accepted, an inference could be drawn that the aiming of the

2  weapon indicated an intent to harm.  If inferences are drawn in plaintiff's favor, the purposeful

3  discharge of the stinger rounds at plaintiff could be viewed as malicious.  As previously noted, it

4  is not for this court to determine credibility on a motion for summary judgment, Anderson v.

5  Liberty Lobby, Inc., 477 U.S. at 249, 106 S. Ct. at 2511.

6           *Qualified Immunity*

7           In resolving a claim for qualified immunity the court addresses two questions: (1)

8  whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the

9  officers' actions violated a constitutional right and (2) whether a reasonable officer could have

10  believed that his conduct was lawful, in light of clearly established law and the information the

11  officer possessed.  Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).   Although the

12  Supreme Court at one time mandated that lower courts consider these two questions in the order

13  just presented, more recently the Supreme Court announced that it is within the lower courts'

14  discretion to address these questions in the order that makes the most sense given the

15  circumstances of the case.  Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009).

16           The court has found that taking the facts in the light most favorable to plaintiff,

17  which it must on this motion for summary judgment, that defendant Martin's concededly

18  unauthorized action in discharging a 40B stinger into plaintiff's cell during the December 20,

19  2001, cell extraction raises a genuine question of material fact as to whether plaintiff's Eighth

20  Amendment rights were thereby violated.[17]  Moreover, the factual issue of Martin's alleged

21  reference to a canine outcome for plaintiff is very disputed.  The "aiming" fact is disputed.

22  When such actual factual disputes exist, as opposed to merely differing inferences from,

23  undisputed historical facts, summary judgment on qualified immunity is inappropriate.  Glenn v.

24

---

25       [17]Of course, if the trier of fact determines that the firing of the 40B stinger round was
    accidental, i.e, there was no aiming, or no threats were ever made, there is no Eighth Amendment
26  violation in this case in the first instance given its context of discipline control.

Washington County, 673 F.3d 864, 872 (9th Cir. 2011).  Until such factual issues are resolved,

inferences cannot be dispositively drawn, and the issue of whether a reasonable officer could

have believed such (disputed) conduct was lawful in light of clearly established law and in light

of the information he possessed cannot be made at this time.  The motion for summary judgment

as to defendant Martin must be denied.

### *Defendant Kopec*

Plaintiff seeks to implicate defendant Kopec for an Eighth Amendment violation

for having authorized the cell extraction on December 20, 2001.  FAC, p. 3.  Defendant T.

Kopec, undisputedly employed as Acting Facility Captain at HDSP at the relevant time,

maintains that he did not and could not authorize use of the 40B stinger round.   It is not in

dispute that defendant Kopec was not present during the cell extraction.  It is undisputed that

defendant Kopec was not responsible for defendant Martin's training.  Although it is not in

dispute that neither defendants Martin or Kopec nor non-party Lieutenant Wright (defendant

Martin's direct supervisor during the extraction) can recall whether they knew, at the time of the

extraction, of plaintiff's alleged assault on a correctional staff person the day before the cell

extraction at issue, plaintiff asserts that circumstantial evidence gives rise to defendant Kopec's

involvement.  Plaintiff cites defendant Kopec's declaration that he "authorized only the use of

force necessary to bring Graham under control and restore discipline and institutional safety and

security."  Opp., p. 43, Rsp. to DUF, citing MSJ, Ex. B, defendant Kopec Dec., ¶ 15.  Plaintiff

also calls up his deposition testimony, wherein defendant Kopec explained that "necessary" force

"depends on what the lieutenant and the extraction deemed necessary force to make the inmate

comply with their lawful orders."  Opp. at 43, citing Kopec Dep. 75:13-15.  Plaintiff maintains

that defendant Kopec did not have authority to authorize the use of any force necessary to carry

out the cell extraction under the applicable prison policy, OP (Operational Procedure) 118.  Id.,

& Ex. 12 (OP 118).   Plaintiff argues that under OP 118, defendant Kopec, temporarily elevated

to the position of Acting Captain, did not possess the full authority of a captain, and defendant

1    Martin took the authorization to use both a stinger round and OC, the use of either of which

2    defendant Kopec under the 2001 prison policy, along with the use of the 40 mm launcher), did

3    not have the authority to approve.  Opp., Rsp to DUF, p. 42, citing Kopec Dep. 29:3-7, 36:6-9,

4    39:22-40:2, 41: 19-22 & Ex. 12 at 4.  Defendant Kopec, supported by testimony of non-party

5    Wright, concedes that the written policy (OP 118) is ambiguous, inasmuch as, under "authorized

6    extraction equipment," it states, inter alia, "37mm Launcher (requires regional administrator

7    authorization)," while under "equipment use," the following, in part, is stated: "the 37mm

8    Launcher with the Def-Tec # 20F round is a less lethal force weapon that may be used with

9    authorization of the ~~Regional Administrator~~ *Warden or Chief Deputy Warden as a barricade*

10   *remover*."   Reply to Rsp to DUF, pp. 12-16, citing Opp., Ex 12, OP 118 at 3-4 (strike-out and

11   italics in exhibit).   As defendant also points out, the policy does not require approval by the

12   regional administrator, but does state under "authorized extraction equipment" that "Oleoresin

13   Capsicum (supervisors only, requires Captain/AOD approval)," while under "equipment use,"

14   the use of OC does not list any authorization requirement.   Id., OP 118 at 4.  Nevertheless, both

15   defendant Kopec and non-party Wright testified that regional administrator authorization for the

16   37 mm launcher was only required for the Def-Tec # 20 F round (which, indeed, the policy

17   expressly references) and that use of the launcher to deploy at T21 round did not require approval

18   by the warder or regional administrator.  Id., citing Defendant Kopec Dep. 40:15-41 (defendant

19   Kopec testifies that section referencing the need for regional administrator approval for use of the

20   37mm launcher had been revised and superseded by the section requiring only warden or chief

21   deputy warden approval), 42:14-43:11, 50:15-25; Wright Dep. 50:1-53:1 (noting, inter alia, that

22   indicates the revision of cell extraction policy states that it occurred in September of 2001, which

23   means it would have governed the extraction of Dec. 20, 2001, 52:6-12 (testifying that approval

24   of warden or regional administrator was not required for use of for T-21 OC round).  Moreover,

25   defendant Kopec repeatedly testified, as he avers, that he did obtain the requisite approval to

26   authorize the cell extraction and that the use of necessary force came within the limitations of

1  policy.  Kopec Dep. 28:14-29:2 (attesting that he got "prior approval from higher up" for the

2  "calculated use of force" before authorizing plaintiff's cell extraction which "based on what the

3  policy was to use in that calculated use of force"; 31:16-21 (testifying that he never instructed an

4  officer to act without getting proper authorization, stating "I spent 32 years in the military.  I

5  learned chain of command"); 43:19-24, 44:4-45:1 (testifying that he would authorize the use of

6  "what was authorized by policy"; "I would not say, 'You have to use this, you can't use this,' it's

7  whatever the policy was, the cell extraction team would determine what was the best equipment

8  to use at that time"; "I would give them the authorization from higher up that I received for them

9  to do the cell extraction per the policy... They knew what was authorized, they what

10  circumstances authorized them to use it.  I could not tell a lieutenant what to use and what not to

11  use, he knew what to use based on the circumstances"; 74:25-75:19 ("Q.  Did you yourself have

12  the power to authorize the cell extraction team?  A.  No, that was from higher up.  I was acting

13  captain.  I had to get approval from a higher authority... Q. ...Did you have in December 2001 the

14  power to authorize use of force.  A.  After I got approval from my supervisor, yes"; also

15  testifying the necessary force was "what the lieutenant and the extraction team deemed necessary

16  force to make the inmate comply with their lawful orders. )."  Nor is plaintiff's citation to a

17  portion of the policy that speaks of use of a 37 mm launcher and simply does not reference use of

18  a 40 mm launcher sufficient to counter defendant's evidence in support of such use.  See Reply

19  to plaintiff's rsp. to DUF, citing Declaration of K. Bloem, non-party HDSP Armory Officer since

20  2004, employed by CDCR at HDSP since 1995 (¶ 1).[18]  Declarant Bloem declares that use of the

21  37mm launcher was being phased out and replaced by the 40mm launcher in 2001, that other

22  than the 3mm difference in barrel size, the only significant difference of the 40mm from the

23

24      [18] When questioned, defendant Kopec testified that it was his understanding that the 37
mm launcher was similar to the 40 mm launcher and that those policies applicable to the 37 mm
25  launcher "should" apply to use of the 40 mm launcher.  Defendant Kopec Dep. 40:15-22.  Non-
party Wright testified that the policies applicable to a 37 mm launcher, a precursor to the 40 mm
26  launcher would be applied to use of a 40 mm launcher.  Wright Dep. 51:5-11.

37mm launcher was the rifling in the barrel which increased of the accuracy of projectiles but would not have affected deployment of 40B stinger or T-21 blast dispersion rounds because the cartridges containing those munitions were not released upon their deployment.  Bloe Dec., ¶¶ 2, 5.

All of this back and forth about the regulations, i.e., what weapon was authorized to be used when, does not bear on Kopec's state of mind, or what he did, or did not do, on a particular day when exigent circumstances had arisen out of his presence.  It is not enough for Eighth Amendment supervisory liability that a supervisor's actions, or inactions, can in some technical sense be argued to have "set in motion" a series of events which culminated in some other officer's use of force in a malevolent fashion. A supervisor with an "innocent" state of mind simply cannot be liable because some act on his part may have, from a "for want of a shoe the horse was lost ...." actual cause standpoint, contributed to a certain outcome.  If plaintiff's theory were to hold water, Kopec's calling in sick the day of the incident would have left him liable.  Obviously, there is no bottom to plaintiff's Kopec liability bucket.

Rather, the supervisor himself must have acted in some grossly reckless or purposeful fashion which substantially encouraged the actual actor to "lay out the punishment." Moss v. U. S. Secret Service, 675 F.3d 1213, 1230-1231 (9th Cir. 2012) ("But [section] 1983 plaintiffs nevertheless some 'culpable action or inaction' for which a supervisor may be held liable."). See also Larez v. City of Los Angeles, et al.,, 946 F.3d 630, 945-946 (9th Cir. 1991) (Chief Gates had purportedly whitewashed many previous investigations into police officer misconduct thereby giving the defendant officers a mind set of immunity when it came to misconduct).  In their argument about the regulations, plaintiff merely points to the fact that Kopec did not authorize, or could not, authorize the use of a particular weapon.  But without more, such an allegation is an Eighth Amendment "so what."

\\\\\

\\\\\

As the undersigned intimated at the hearing on the motion, the arguments required to implicate Kopec involve leaps that are far too speculative.  See docket # at pp. 3-7.[19]  Plaintiff concedes that defendant Kopec may not have had specific knowledge that a 40B stinger round was to be deployed.  See Opp., plaintiff's response to DUF 61.   However, plaintiff contends that this defendant was on notice that one of his subordinates might seek to retaliate against plaintiff during the cell extraction due to the alleged head-butting incident.  For support for this contention, plaintiff cites an excerpt of defendant Kopec's deposition.  Id.

> Q.  After the cell extraction would anyone from the cell extraction team report to you about - -
> A.  The lieutenant would always make a report to me because I would ask, you know, he would always tell me, "everything went fine, nobody got injured, the inmate cuffed up when we showed up at the cell."  You know, we would get an after action report, you know, and then he would tell us verbally and then everybody would be writing their reports, and then I would review the written reports at a later date.

Defendant T. Kopec Dep. 32:11-19.

The fact that an after action report is usually made is not evidence that defendant Kopec received such a report regarding the incident of Dec. 19, 2001, nor is there *any* evidence that this defendant ever knew of alleged retaliatory threats preceding the December 20, 2001, cell extraction being made by defendant Martin and/or others.   It is not in dispute that defendant Martin's direct supervisor, Lieutenant Wright, was present during the extraction and that it was determined (uncontroverted) that force was necessary to remove plaintiff from the cell.

Plaintiff also made reference to a disputed fact as to whether certain regulations required Lt. Kopec, as acting captain,  personally to be on the scene of a cell extraction, and since he was not and was busy elsewhere, this tends to "prove" that Kopec knew exactly what was going to take place so he could be absent thereby  "causing" the incident.  Or perhaps, plaintiff is arguing that if only Kopec had been on the scene, as opposed to his essential equal, non-party Lt.

---

[19] Referencing the court's electronic pagination.

1  Wright, Sgt. Martin would never have purposefully used the 40 B stinger round.   All of this is

2  the grossest of speculation.  There is no evidence which remotely allows the inference to be

3  drawn that plaintiff is seeking the court to draw.  There is no evidence to suggest that Kopec had

4  any more knowledge than non-party Lt. Wight had, concerning any action that Martin might, or

5  might not, take.

6          Finally, in order for a supervisor to be liable in the § 1983 context, there must be

7  causative effect between what that supervisor did or did not do, and the violation of the

8  Amendment at issue. See Leer v. Murphy, 844 F.2d 628, 633 (9th Cir.1988) (holding that to

9  establish liability under 42 U.S.C. § 1983, a plaintiff must show a defendant's acts or omissions

10  caused a constitutional deprivation); see also McSherry v. City of Long Beach, 584 F.3d 1129,

11  1138 (9th Cior. 2009) (summary judgment requires facts, not... rank speculation); Nelson v. Pima

12  Community College, 83 F.3d 1075, 1081-82 (9th Cir.1996) ( "mere allegation and speculation do

13  not create a factual dispute for purposes of summary judgment").

14          Because the court does not find that there is a genuine issue of material fact that

15  has been raised as to whether plaintiff's Eighth Amendment rights have been violated by

16  defendant Kopec, there is no occasion to consider defendant Kopec's entitlement to qualified

17  immunity.

18          Accordingly, IT IS ORDERED that:

19          1.  Defendants' motion for summary judgment, filed on March 29, 2012 (docket #

20  97) be granted in part and denied in part: GRANTED as to defendant Kopec, and DENIED as to

21  defendant Martin;

22          2.  This matter will proceed to trial as to defendant Martin on plaintiff's claim of

23  an Eighth Amendment violation by defendant Martin's undisputed discharge of the 40B stinger

24  round; and

25  /////

26  /////

1    3. The dates for the final pretrial conference and trial in this matter to be held

2 before the undersigned are hereby set as follows: the final pretrial conference will be held on

3 January 10, 2013, at 10:00 a.m., and the trial is set for February 25, 2013, at 9:00 a.m.

4 DATED: July 23, 2012

5              /s/ Gregory G. Hollows

6             _____

7             GREGORY G. HOLLOWS
              UNITED STATES MAGISTRATE JUDGE

8

9

10 GGH:
  grah2291.msj

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26